Geiger, J.
An election was held on March 14, 1905, in the municipal corporation of South Charleston, Ohio, under the provisions of an act commonly known as the Beal Law, Vol. 95, page 87, Ohio Laws.
The result of the election was certified by the judges to be—
“For the sale of intoxicating liquors as a beverage, 166 votes; against the sale of intoxicating liquors as a beverage, 167 votes; three ballots not miarked, .and two ballots marked incorrectly.”
On the 24th day of March, and within the time limited by the statute, a petition was filed in the probate court to contest the result of the election. The contestors- claim that the election was illegal and invalid for the following reasons: That there were no ballots cast at said election which were printed as required by law; that illegal votes were cast at the election by persons not entitled to vote, which changed the result of the election ; iand that a ballot was illegally thrown out by the judges; that said election was not petitioned for by forty per cent, of the qualified élebtors at the last municipal election of said corporation.
Many questions have arisen in the course of the trial, and such as seem to the court to be important will be passed upon in the order in which they were presented.
*375 The first claim made by the contestors is that the petition filed with the city council does not show upon its face the required percentage of electors in said corporation, and that the action of said council in ordering the election was illegal and void, and that the election for that reason should be set -aside.
The petition for the election, as filed, contained 136 names. A committee of council was appointed to investigate the petition, and reported that in their opinion there were the sign atures of 128 qualified voters upon the petition, and that it required J.24 signatures to call an election; such number being forty per cent, of the number of votes cast at the November election of 1904, to-wit, 309 votes. The council thereupon ordered the election, and -a certificate of the result was entered by the cl-erlr upon the minutes of council.
It is contended that, under the provisions of Section 4364-20e, Revised Statutes, in municipalities having wards the petition would be sufficient if signed by as many qualified voters as equal in number forty per cent, of the votes cast in said municipal corporation at the last preceding general election; and that, in all 'other municipalities not having wards (as is the case of South Charleston), the phraseology “forty per cent, of the qualified electors- at -the last preceding municipal election” requires the petition to contain forty per cent, of all who may have been electors, whether they voted or not, at the last preceding municipal election; and it is sought to introduce evidence to show that there were electors in South Charleston at the time of the November election of 1904 who did not vote, and that- the total number of electors upon which the percentage is based would be the number voting, to-wit, 309, plus the number who were qualified to vote, but did not vote.
It is necessary, then, to determine the meaning of the phrase “forty per cent.- of the qualified electors at the last preceding municipal election.”
Section 4364-20a provides that whenever forty per cent, of the qualified electors in a municipal corporation shall petition for an election, a special election shall be ordered. Section 4864-20e endeavors to define what this forty per cent, should *376 be in the two classes of municipalities. It is evident that the Legislature in passing Section 4364-20e endeavored to lay down a rule that would enable those petitioning for an election to determine when they had a sufficient number upon their petition. If we adopt the construction that the phrase “forty per cent, of the qualified electors at the last preceding municipal election ” means forty per cent, of the total number of those who were electors, whether or not they exercised' their right of franchise, then the rule is -but an imperfect one, as those desiring to petition for an election would have no means of determining whether or not they have secured the requisite number, without taking a census of the electors of the municipality; whereas, if we accept the construction that the phrase means forty per cent, of the qualified electors who voted or exercised their right of franchise at the last preceding municipal election, then we have a fixed and certain rule by which the petitioners may be guided.
It is urged that the Legislature would not have changed the phraseology in these two provisions without an intention to distinguish in the measures by which the forty per cent, would be determined; but it appears to this court that the two provisions, one for municipalities having wards, and one for municipalities not having wards, relate wholly to' the number of votes cast at the different elections provided for by said section. In municipalities having wards the number on the petition must be forty per cent, of the number of votes east at the last preceding general election: while in the case of municipalities not having wards it should be forty per cent, of the votes cast at the last preceding municipal election; the only difference between the two provisions being the election which should be used as a standard in determining the forty per cent. This position seems to be sustained in Hines v. Hillsboro, 3 N. P., page 17.
The contestors claim further that the term “forty per cent, of the qualified electors at the last preceding municipal election” requires that .the petition be sighed by forty per cent, of those individuals who appeared and cast their ballots at the said election ; and that it is not sufficient to have forty per cent, of the *377 number; but the very individuals who voted at the last preceding municipal election should sign the petition to the extent of forty per cent. This position is not tenable. The intention of the Legislature was not to give to the voters who east their ballots at the preceding election any advantage over those who, by reason -of absence, sickness, or other cause, did not. The body of the electors, as it may have existed at -the last preceding-election, may have phanged considerably at the time of the filing of the petition, by reason of death', or otherwise. The plain intention of the statute is that when the petition is signed by as many qualified electors .as shall equal forty p.er cent, of those who oast their votes ¡at the last preceding election, then the petition shall be sufficient.
The next question arises upon the offer of the contestors to prove that the publication of the mayor’s proclamation was not for the time specified by the statutes. This at once brings us to the consideration ¡of the question, whether or not the contestors can introduce testimony upon -points not set out in the petition. The petition states that the -election was illegal, and then enumerates certain grounds upon which it- is illegal. Said grounds relate to the ballot cast, illegal votes, and the throwing -out of a vote, and the ground that the election was not petitioned for by the requisite percentage of electors. Nothing is said in the petition about the proclamiation of the mayor; no allegation is made that the election was illegal for that reason. It is claimed by contes-tors that the statement in the petition that the election was illegal should allow them to introduce any evidence which would tend to show su-eh illegality, and that it ■opens, the door wide to the introduction of testimony upon any point; and, therefore, that it is proper that they introduce- testimony to show -that the publication by the mayor was not for a sufficient time.
Section 4364-20e provides that the probate judge in the procedure of the hearing shall be guided by the law providing for contest of the -election of a justice of the peace; thus making the statutes in referenoa. to the contest of the- election of a justice of the peace of governing force so far as they are applica *378 ble. Referring to Sections 568-575, Section 572 provides that the contestor shall make known to the probate'judge “the points on which the contestor means to contest such election, ’ ’ and that the judge shall communicate ’the same to the person whose election is contested. Section 575 provides that “no evidence shall be admitted but such as relates to the points stated in the notice. ’ ’
In analogy Section 2997, et seq., provides that notice of the contest of the election of a county officer must be given to the contestee, and shall state the grounds of the contest and the names of two justices of the peace before whom depositions shall be taken. Section 3000, Revised Statutes, provides that the justice shall not receive testimony upon any point not named in the notice.
It is clear to the court that the general allegation in a petition that the election was illegal is not sufficient to admit testimony upon “points” other than such as may be specified in the petition. If this was not so, the contestor might come into court stating no specific “point” upon which he relies, and upon trial introduce testimony that might relate to any and all matters touching the election; and the contestee would have no hint of the “points” he would be required to meet (Howard v. Shields, 16 O. S., 184). Nor is it competent for the contestors to amend their petition after the expiration of the twenty days after the election, as the proceeding for the contesting of an election is a special one, and the statutes providing for a proceeding in the court of common pleas do not apply. See In re Gorey, 2 N. P.-N. S., pages 389-403.
There is another ground upon which the testimony upon the publication of the mayor’s proclamation may well be excluded, and that is the publication as given for the purpose of apprising the electors of the pendency of the election, but that such publication is not necessary if the electors are otherwise apprised of such election. It appears that, in this ease, at the last preceding election 309 votes were cast in this municipality, and that in the election now contested 338 votes were cast, it clearly appearing that the electors of the municipality were fully *379 informed of the pendency of the election and participated in the same. (Fite v. State of Ohio [Wood County], 4 C. C.—N. S., page 81, where a large number of cases are cited). The Supreme Court in the case of Foster v. Schraff, 15 O. S., page 532 (on page 537), say:
“We have mo doubt that where an election is held in other respects as prescribed by law, and notice in fact is brought home to the great body of voters, though derived through means other the proclamation which the law prescribes, such election would be valid.”
The court must hold that the testimony as to the irregularity of the mayor’s proclamation is properly excluded.
The next objection to the legality of the election is that the ballot used was not of the form prescribed by statutes for elections under the Beal Law, but was of the form prescribed for local option elections in townships. Under Section 4364-206, Vol. 95, page 89 O. L., the form is provided for ballots under the Beal Law: “The ballots at any special election held under the provisions of this act shall he printed with an affirmative and negative statement, to-wit, ‘The sale of intoxicating liquors as a beverage shall be prohibited;’ ‘thie sale of intoxicating liquors as a beverage shall not be prohibited’, with a blank space on the left side of each statement in which to give each elector an opportunity to clearly designate his choice by a cross-mark”.
Section 4364-25, providing for local option elections in townships, reads “persons voting at an election held under the provisions of this act, who are opposed to the sale of intoxicating liquors as a beverage, shall have written or printed on their ballots ‘Against the sale’, and those who favor the sale of such liquors shall have written or printed on their ballots ‘For the sale.’ ”
The tickets actually voted at this election contained in large type at the head of each ticket “Special Local Option Election; South Charleston, Ohio”, and underneath a box having at the top “For the sale” and at the bottom “Against the sale”, with a blank space at the left side of each statement. It is claimed by the contestors that the provision as to the form of ballot is *380 mandatory and that the ballots not having been printed with the statement designated in the Beal Law, but with the statement in the township local option law, were illegal, and that consequently the election is void.
It will be observed that the two forms, the one prescribed for the Beal Law election, and the one prescribed for the township election, preserve the same position on the ballot for the proposition submitted to the electors, unless it might be construed that in the elections in townships an Australian form need not be used. On the ticket as printed, those in favor of the sale of intoxicating liquors voted the proposition first upon the ballot, which reversed the position prescribed by the Beal Law, as well as using the proposition provided by the township law instead of the Beal Law.
It appears that the ballots were never opened or exhibited from the time they left the printer’s hands in sealed packages, until they were opened on the morning of the election, when the mistake was discovered, when considerable discussion took place concerning the different forms, but the election was finally pro-ceded with. By-reference to the poll book it will be seen that the first vote was John Way, one of the eontestors of this election, and that J. B. Malone, the other contestor, voted the seventeenth ballot. It fairly appears from the testimony that both these eontestors were present at the time the ballots were opened and heard the discussion in relation to the form of ballot.
Am. & Eng. Enoy. of Law Vol. 10, page 714, states the proposition, “The rule of law is well settled that objection to the form and contents of official ballots must be made before the election, and that when a person fails at the proper time to take any steps to correct errors in such ballots, he can not after being defeated, be heard to complain if there is an error in the ballots of which •he had knowledge, and he might have corrected prior to such election,” and a large number of eases are cited sustaining this proposition. The above citations refer particularly to the form of the-ballot where 'different candidates .are being voted for, *381 but the same rule would certainly apply where the ballot voted is upon any given proposition.
Yol. 10, Am. & Eng. Ency. Law, page 725, states the rule in reference to form of ballots upon any given proposition, as follows—
“Where there is no ambiguity, the fact that the designation of the office is not technically accurate nor formal will not invalidate the ballot. When elections are held for other purposes than to choose officers the same principle prevails that neither a lack of absolute precision nor the use of surplusage will vitiate the vote if the meaning can be ascertained.” See cases cited.
In the ease at bar the form of ballot must be construed to be sufficient to express the two propositions, as it contains the statement prescribed by statutes in the holding of an election for local option in townships, and being sufficient to inform the voter properly in a township election, it certainly is sufficient to give him the necessary information when he is voting within the limits of a municipal corporation; so that, the objection that the voters were deceived by the form of ballot has not great weight, as they are supposed" to be intelligent enough to read the ballot.
Under the general rulings of courts that mere irregularity in form, where it does not mislead the elector, will not invalidate an election, the court must hold that the form of ballot used in this case, although it is not the form laid down in the statutes, is not a sufficient reason to invalidate this election; and further, that the two contestors in this case, having participated in this election and having hereby sanctioned the form of ballot used, can not now be heard to complain. It may be claimed that the contestors had no alternative but to use the form of ballot furnished, as it was too late to correct the same, but by the provision of the Hypes Election Law, Yol. 97, page 230, O. L., it is provided that if there is no official ballot provided, “unofficial ballots may be used, so- that no elector, for lack of a ballot, shall be deprived of his franchise.” Under that provision of law, should- no official ballots have been furnished, unofficial ballots *382 might have been printed in a very short time and used at the election.
The next irregularity claimed by the eontestors relates to the vote of Charles Warrington, a blind man, and Laybourn Haughey, a man ninety-four years of age. These two bailóte will be considered together. The evidence shows that in each ease the elector was driven in a carriage to the curbstone in front of the building where the election was being held, the ballot box being at a point about 50 feet from the curbstone, in a room not directly facing upon the street, but connected with the street by a hall-way. In the ease of each of these voters information was sent to the election officers that he was present at the curbstone in a carriage, ready to cast his ballot, and thereupon two of the judges of election took with them a ballot and went to the carriage and secured the vote of the elector, and, in each ease, the ballot was then taken by the judges and deposited in the ballot box. No claim is' made by the eontestors that the voters were influenced, or the ballot in any manner altered before being deposited in the ballot box. It is insisted by the eontestors that •the Australian Ballot Law provides a method of easting the vote,-..' which must be strictly followed, and that it requires the elector to proceed into the enclosed space, and after having received the ballot from .the judges, to retire into the booth provided, and there in secret mark his ballot; and these two ballots not having been cast in accordance with such provision of the statutes, are illegal and should -be thrown out.
The Constitution of Ohio, Article Y, Section 1, provides that—
“Every white male citizen of the United States, of the age of 21 years, who shall have been a resident of the state one year next preceding the election, and of the county, township, or ward, in which he resides, such time as may be provided by law, shall have the qualifications of an elector, and shall be entitled to vote at all elections.’’
To promote the secrecy and purity of the ballot the Legislature enacted the law known as the Australian Ballot Law. Section 2966-37 has the following provisions—
*383 “An elector who declares to the presiding judge of election that he is unable to mark his ballot by reason of blindness, paralysis, extreme old age, or other physical infirmity, and such physical infirmity is apparent to the judges to be sufficient to incapacitate the voter from marking his ballot properly, may, upon request, receive assistance in the marking thereof of two of the judges of election, belonging to the different political parties, and they shall thereafter give no information in regard to the matter.”
We may well inquire whether a law which would provide methods of voting by which the aged, blind, infirm, or paralytic would be excluded from an election, would not be in conflict with the provision of the Constitution above cited. It is claimed that the object of the Australian Ballot Law is to preserve the' secrecy of the voter, and that when this is violated by the election judges going to the eurbstone and receiving in the presence and possible hearing of bystanders the ballot, that such a ballot must necessarily be in conflict with the provisions of the law and void.
The judges are allowed by the statutes to assist the blind and infirm, the paralytic, and those suffering from physical infirmities which are apparent. It may well happen that the physical infirmity is such as would prevent the voter from leaving the carriage or reaching the actual presence of the ballot box, and the paralytic may be suffering from paralysis of the legs as well as the arms. The law constitutes the election officers the arm, or the legs, or the eyes of the afflicted person, as the case may be. There is no reason why a person paralyzed in the arms should receive assistance, while those having no use of the legs should have no assistance.
It clearly appears to the court that the term used in the statute, “Mark the ballot properly” means not only marking so far as the same is done with a lead pencil, but permits the requisite aid incident to such assistance as the voter requires in casting his ballot, within reasonable limits. It is highly proper that restrictions be placed upon the method of casting a ballot, but it is equally proper that certain latitude be given in case of necessity. The end of the Australian Ballot Law *384 ■is not the secrecy of the vote, but the purity of the election, and if the secrecy must, for any reason, be lifted, if it does not result in fraud, the vote should not be declared invalid. See 10 Am. & Eng. Eney. Law, page 703, and eases cited..
If the constitutional provision that persons having the required qualifications shall be entitled to vote, and the statutory provision as to the assistance of afflicted voters are not broad enough to allow this method of voting, then we must examine and determine, if possible, whether or not the casting of a vote in this manner is such an irregularity on the part of the election officers .as would invalidate the ballot. The judges are properly assumed to be familiar with the law, and the voter easting his ballot in pursuance of their instructions, either expressed or implied, where there is no fraud claimed, should not thereby be deprived of his vote, unless such irregularity is of sufficient importance to effect the honest expression of the people.
The. general rule as to the irregularittis is laid down in 10 Am. & Eng. Eney., page 766, as follows:
“The general principles -to be drawn from the authorities are that honest mistakes, or mere omission on the part of elction officers, or irregularities in directory matters, even though gross, if not" fraudulent, will not avoid an election, unless they affect the result, or at least render it uncertain. But if the irregularities are so great that the election is not conducted in accordance with law, either in form or substance, and render the result uncertain, or where they are fraudulent and the result is rendered uncertain thereby, the election should be set aside.” See cases cited on page 767.
In Fike v. State of Ohio, supra, election laws are held to be construed liberally, so as to preserve the will of the people, if possible, and not to defeat their choice as expressed by an election.
The court must therefore hold that these votes received at the curbstone were not illegal, first, because they were taken substantially as provided by Section 2966-37; and, second, if the provisions of that section are not broad enough to allow them to be so taken, the irregularity was that of the election officers, and not of the voter, and wais not of such a nature as *385 to render the election uncertain, or as to interfere with a full and free expression of the people’s choice.
The number of votes certified' for the sale of intoxicating liquors was 166, the number against the sale of intoxicating liquors was 167, and the number of ballots returned by the election officers as illegally cast was five, making a total of 338. It is claimed that 167 votes having been east against the sale, that such number is not a majority of the total number of votes cast, to-wit, 338, and therefore that the election was not as certified on the minutes of council.
Section 4364-20e provides that “a majority of the votes cast” at such election shall be in favor of prohibiting the sale of intoxicating liquors as a beverage, etc. The question presented is, therefore, whether the ballots returned as il-legaly east are to be counted as east, for the purpose of determining what is a majority. The eontestors claim that all ballots that went into the box should be counted as having been cast. The five ballots were returned by the election officers under the provision of the law requiring the returning to the deputy state supervisors of ballots concerning the legality of which there is any doubt or difference of opinion. These five ballots, upon examination, are clearly illegal, there being no mark on any of them, by which the intent of the voter might be determined.
The provisions of the Beal Law are that, if a majority of the “votes” cast shall be in favor, * * * etc. And under the provisions of the Hypes Law, the expression “ballots cast” is used, there being a distinction between a vote and a ballot. A vote is an expression of a choice (State v. Green, 27 O. S., 230). A ballot is a printed or written slip of paper upon which a choice may, or may not, be expressed. The casting of these ballots not properly marked was not the 'easting of a vote, and consequently the number of votes cast is not the total number of ballots in the box, but the total number of ballots on which the expression of a choice is indicated, and the total number of votes cast was 333, and not 338. See Dexter v. Raine, Auditor, et al, 18 Weekly Law Bulletin, 61; affirmed by the Supreme Court, 18 Weekly Law Bulletin, 301.
*386 The next question to be considered is that in relation to one Leroy Pitzer, who is alleged by the contestors to be an idiot or insane person within the meaning of the Constitution of the state of Ohio. Section 6, Article Y, of the Constitution of 1851 provides that no idiot or insane person shall be entitled to the privileges of an elector. It is claimed by the contestees that the mental condition of Leroy Pitzer does not bring him'within either class, that of idiots, or that of insane persons. A great many authorities have been cited as to the correct definition of “idiot”, and “imbecile,” and “feeble-minded’’, and “insane”. Medical definitions and legal definitions on this subject seem not to be in exact accord. Church and Peterson, medical writers on nervous and mental diseases, on page 767 define idiocy as “mental feebleness due to disease or defect of brain, congenital or acquired during its development.” They hold that the term idiocy is generic, including all degrees of mental impairment in early life, idiocy being the lowest degree of mental disability; imbecility a higher degree, and feeble-mindedness is defined as a degree of idiocy in which the psychic faculties have their' highest development.
15 Am. & Eng. Ency. Law, page 924, defines an idiot as one who has had no understanding from his nativity. Bouvier, on page 678 defines idiocy to be a form of insanity resulting either from congenital defect, or some other obstacle to the development of the faculties in infancy; and an idiot to be a person who has been without understanding from his nativity. Pie defines imbecility, on page 682, to be a form of insanity consisting in mental deficiency either congenital or resulting from obstacles superventing in infancy. It will be observed that he defines both idiocy and imbecility to be a form of insanity, and his distinction between the two is not cAar.
Considering the uncertainty of a proper definition of the word “idiot”, we may properly, for the time pass from, its furtheri discussion, to that of the other term used in the Constitution as a disqualification for an elector. An “insane person” as well as an “idiot” is prohibited from voting. 16 Am. & Eng. Ency. Law, (2d Ed.), page 562, defines'the word “insane” as a general *387 term, not confined in its application to persons who are wholly without understanding. Idiocy, lunacy, imbecility and feeble-mindedness'are all treated in the encyclopedia under the general head of insanity. 1 Bouvier’s Law Die. (1877), 716, defines insanity to be “the prolonged departure without any adequate cause, from, the state of feeling and modes of thinking usual to the individual in health. ’ ’ Church and Peterson define insanity as a “manifestation in language or conduct of disease or defect of the brain.” Various statutes in Ohio define insanity for the purpose of the 'chapters in which they occur. (Revised Statutes, 720, 853, 3027, 5636-907, 5240, 671 and 6302).
It is claimed by the contestees that the term “idiot” and “insane person”, as they .appear in the Constitution of 1851, must be interpreted as to their meaning, by the scope given these terms at that time. In the case of Clark v. State, 12 Ohio, pp. 483-8, decided in 1846, a number of definitions occur and an interesting discussion of the question of insanity. The court says on page 488—
“It exists in all imaginable varieties and in such manner as to render futile any attempt to give, a classification of its nu>merous grades and degrees that would be of much service, or under any circumstances safe to be relied upon; and much assistance can not be derived from metaphysical speculation. ’ ’
On page 489, the court says, “insanity is a disease of the mind.” The case of Farrar v. State, 2 O. S., page 54, decided in 1854, two years after the adoption of the Constitution, contains a very long discussion of insanity. The judge, on page 68, says, “I can not imagine her as other than idiotic or imbecile”; and on page 69, “It is enough to say that I think it proves her weak-minded and imbecile.” The whole discussion shows that, to the mind of the judge, the term “insane person” would include an idiot, an imbecile, or :a weak-minded person. The charge of the trial court, in which he says that insanity in its general legal sense is the inability to distinguish between right and wrong, is approved.
In the case of Loeffner v. State, 10 O. S., page 598, et seq., on page 604 the trial judge charged “insanity, indeed, exists *388 in so many shapes and forms, and has so many varied insignia and manifestations, that it is almost impossible for science to comprehend it or give it intelligent definition. * * * The
classes, species, and modifications are not well understood by any of us, learned or otherwise. It seems, indeed, as indefinite in extent as mind itself.” This charge was sustained by the Supreme Court.
In the ease of Maecconnehey v. State, 5 O. S., 77, decided in 1855, the court says “delirium tremens, although the result or consequence of continued drunkenness, is insanity, or a diseased slate of the mind, and affects responsibility for crime in the same way as insanity produced by any other cause. ’ ’
In the case of State v. Crew, 10 W. L. J., 501, decided in 1853 by Justice Nash, it was held that the term insane in the act against having carnal knowledge of an insane woman, means a person of unsound mind, and includes an idiot. The discussion in this case is valuable. See also Loers Heirs v. Truman (1852), 10 W. L. J., 250; In re Tempest, 21 Bull., 301; 22 O. S., 271; Ross v. Todd, 4 C. C., p. 1.
The only case in Ohio that comes to the attention of the court, in which the term “idiocy” or “insanity” is in any way referred to in the matter of election contests, is found in Sinks v. Reese, 19 O. S., page 306. On page 320 the court holds that one vote should be thrown out because the person was shown to be an idiot; and further holds that the vote of an old man, whose mind was greatly enfeebled by age, was not’properly thrown out. Unfortunately this ease does not disclose the evidence upon which the court determined what constituted an idiot, but it does seem to go far enough to show that a person whose mind is greatly enfeebled by age is neither a lunatic nor an idiot, within the meaning of the Constitution.
The question is, then, whether the mental condition of Leroy Pitzer comes within the definition or description of insanity laid down in the boobs. It' can not be disputed that he is a person of diseased mind, of limited mental capacity, incapable of carrying on in an intelligent manner the ordinary affairs of life, having no distinct ideas upon the question of morality, *389 right iot wrong, and one who would prolbably not be responsible for -any criminal act committed by him. Iiis knowledge is so circumscribed and limited as not to include the most ordinary affairs, having no adequate knowledge of the value of money, or any definite conception of size or direction. The court would not hesitate a moment in adjudging him a proper person to be confined in an insane asylum were the matter brought before the court on an affidavit in lunacy; neither would there be any hesitation in appointing a guardian for him were a proper application made for the purpose, his mental condition being much more defective than in the majority of the cases where the court has been called upon to act in such matters.
He had the ordinary intellect of a child as he grew, until he reached the age of seven years, when he was stricken by a sunstroke, the immediate result of which was paralysis, with all conditions attendant upon complete imbecility. All who have testified concerning him admit that he is weak-minded, and several of the physicians testified that had his condition, as it now exists, extended continuously back to the time of his birth, he would be regarded as an idiot. Others say he is an imbecile. He displayed in his examination considerable shrewdness in some of his answers; but showed an absolute lack of knowledge of the proper way to mark his ballot, although he persisted in the statement that he voted “dry” at the election.
This election resulted in 166 votes being returned in favor of the sale of intoxicating liquors, and 167 votes being returned against the sale. The court can not convince himself that with 166 intelligent men voting on the one side, and 166 intelligent men voting on the other side, the deciding vote should be cast by a man of such limited intelligence as Leroy Pitzer; it clearly appearing to the court that he comes well within the class of persons prohibited by the Constitution from voting, under the term “idiot” or “insane person”, as such terms are defined by medical and legal writers and decisions of Ohio courts, eon-i temporaneous with the adoption of the Constitution of 1851. It is maintained by the contestee that, if he has not intelligence enough to east a vote, and comes within the class inhibited by *390 the Constitution, that his testimony indicated that he cast one of the five ballots that were not counted, and that in this contest his ballot has decided nothing and has been thrown out. The evidence upon this point is simply that of Leroy Pitzer and should be given but slight consideration. It is sufficient to say ■that it is impossible to determine from his testimony how ho voted, or whether he cast one of the five ballots not counted.
It must next be determined by what rule the ballot should be disposed of. By the provisions of Beal Law we are referred to the statutes controlling the election of justices of the peace, and Section 576 provides that no election of a justice of the peace shall be set aside by the freeholders merely because illegal votes have been given at such election, if it appear that the person whose election has been contested has the greatest number of legal votes given at such election, after deducting all illegal votes given Avhen there is no evidence for whom such illegal votes were given, as well as all illegal votes which are shown to have been given for the qerson whose election is contested.
The court being unable to determine from the evidence how the ballot of Leroy Pitzer was oast, under Section 576, above quoted, it must be deducted from the proposition being contested, which leaves the result. 166 in favor of, and 166 against the sale of intoxicating liquors.
The question then arises as to the proper entry for the court to make. It is claimed by the contestors, in spite of the prayer of their petition, that it now becomes the duty of the court to find that the election held resulted in a tie vote, and that therefore the prohibition of the sale of intoxicating liquors was defeated, the provision of the law being that if a majority of the votes east shall be in favor of the prohibition of the sale * * * , etc., it being claimed that unless the proposition to prohibit the sale receives a majority of the votes ease it is lost, and the election shall be declared as- resulting adversely to such proposition. On the other hand it is claimed by the contestees that the vote being a tie vote there is no election, for the reason that there is no selection. The importance of this ¡contest is apparent *391 when it is remembered, that if there has been an election on March 14th, no other election can be held within the period of two years from that date; whereas, if the election is to be set aside another election may be held at once.
The court is free to say, that, had the result as certified by the judges of elections shown a tie vote, there might have been force in the ¡argument of the contestors that there was an election at which the proposition to prohibit the sale was defeated; but the -tie vote now appearing is the result of a judicial determination, and arises from the contest instituted and conducted under the provisions of the statute, and the final entry must be governed by the law relating to contests of election, to-wit, Sections 575 and 576, Revised Statutes.
Section 576 provides that no election shall be set aside merely because illegal votes have been east,- if it ¡appears that the person whose election is 'contested has the greatest number of legal votes given at such election, after the deduction required; the inference clearly being, that where there are illegal votes given, the election must be set aside unless there still remains to the credit of the proposition being contested, the greater number of legal votes. The result in this case does not meet this condition, and the only logical conclusion is that the election must be set aside as -entirely null and void. This conclusion is reinforced by the fact that, in a contest of election under Section 570, all illegal votes that are cast, where there is no evidence for whom such illegal votes were east, must be deducted from the number given for the- person whose election is being contested.
It might well have happened in this ease that there could have been a large number of illegal votes without evidence for which proposition they were cast, and, under this statute, such unknown votes would arbitrarily be deducted from the proposition being contested, 'and thus leave the opposite proposition with the greatest number of votes, although the illegal votes deducted might in reality have been cast for ¡the proposition thus arbitrarily made to prevail. It is a fact that this tie vote has resulted from the arbitrary rule of the statute which requires that the unknown illegal vote of Pitzer be deducted from the proposition *392 contested, and it would be manifestly 'unfair to make such a rule result in a victory for the proposition, which, but for the rule, would have been defeated. The conclusion is irresistible that the statute is intended to prevent the nullification of an election where, after deducting all illegal votes which are unknown and all illegal votes cast for the proposition being contested there still remains for such proposition a majority of legal votes. Of course any illegal votes which could have been shown to have been east for the contestor, or the proposition presented by him, would properly be deducted from the number given to the contestor, or the proposition represented by 'him, although the statute does not expressly cover such a case. State v. Wright, 56 O. S., 540-550.
Walter L. Weaver and Charles E. Ballard, for eontestors.
E. M. Hagan, for contestee.
The entry will therefore be that the election is null and void and the same will.be set aside.
John W. Warrington, E. W. Kittredge, Ellis G. Kinkead and Frank Dinsmore, for the demurrer.
Chas. J. Hunt and Albert II. Morrill, for the city.